UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

LYNN MICHELLE DAUGHERTY )
)
)
)
)
Plaintiff )
)
)
v. )
)
ZACHARY GRAVES, in his individual and )
Official capacity as an employee of the TOWN )
of JACKSBORO, TENNESSEE; )
BEN MARLOW, in his individual and official )
capacity as an employee of the Town of )
Caryville, Tennessee; and )
TOWN OF CARYVILLE, TENNESSEE )
)
Defendants. )
_____)

EXHIBIT A

## EXPERT'S REVIEW OF USE OF FORCE AND ARREST

### I. Introduction

My name is Roy R. Bedard; I reside in Tallahassee, Florida, where I am a full-time Professional Law Enforcement and Corrections Trainer. I am the owner and president of RRB Systems International, a police and public safety product and training corporation headquartered in Tallahassee, Florida that conducts law enforcement, corrections and public safety training throughout the world. I am a twenty-four year veteran of law enforcement and my standards are currently held by the Tallahassee Police Department. I am a listed subject matter expert in police use of force by the Florida Department of Law Enforcement ad the US Department of Homeland Security. I have been qualified in State and Federal Court as an expert in police procedures, police training and use of force. I have been asked by Plaintiff's counsel to review the incident regarding her arrest on May 07, 2010.

1

## II. Qualifications and Background

I have taught a variety of police courses including classes in police and corrections procedures, police management and civil liability throughout the US and abroad. I have taught patrol procedures, traffic stops, criminal investigations, and basic and advanced defensive tactics to academies, corrections and law enforcement agencies throughout Florida and many other parts of the nation. I have provided training and policy development to the Federal Law Enforcement Training Center and the Federal Bureau of Prisons. I have developed police tactics training courses and hold patents, trademarks and copyrights on a variety of police equipment and law enforcement training. I have consulted and produced police films and television shows which are used in colleges and law enforcement academies across the state and nation. These films address police procedures, traffic direction, the use of force and issues involving Civil and Criminal liability.

I received a Bachelors degree from the Florida State University in Criminology and Criminal Justice in 1999 and I am currently in the Master's Program at the Florida State University Educational Psychology and Learning Systems. For the past twenty-four years, I have served as a full time police officer, police trainer and reserve officer. I began at the Florida State University as a patrol officer and participated in most of my police career as a field-training officer. I have been active with the Tallahassee Police Department since 1990.

I am an adjunct trainer at the Florida Public Safety Institute since 1987, in Havana Florida providing training services for basic, advanced and specialized law enforcement and corrections officials.

I am certified as a police instructor by Florida's Criminal Justice Standards and Training Commission. I serve as a task force member to the Use of Force and Defensive Tactics Development Committee for police and corrections at the Florida Department of Law Enforcement in Tallahassee, Florida.

I have previously appeared as an expert witness in a variety of cases, having been qualified in both state and federal courts as an expert in use of force, police procedures and combat stress. My experience and publications are described more fully in the curriculum vitae, prepared by me and attached to this report.

## V. Materials Provided for Review:

- Complaint
- Answer to the Complaint
- Deposition of Michael Russell
- Deposition of Benjamin Marlow
- Deposition of Danny Chapman
- Deposition of Johnny Jones
- Deposition of Zachary Graves
- Deposition of Lynn Daugherty
- City of Jacksboro Police Policy Manual

## VI. Facts of the case

1. On or about May 29, 2011 Officer Ben Marlow of the Town of Caryville Police Department of stopped Michael Russell in the Town of Caryville, Tennessee for swerving his vehicle in the roadway.

2. After the stop Officer Marlow noticed a case of beer and several empty beer cans inside of the vehicle. Officer Marlow invited Michael Russell to engage in several field sobriety tests strictly to determining if he were impaired and unable to operate a motor vehicle.

3. Having not established impairment, Officer Marlow did not arrest Michael Russell.

4. Officer Graves of a neighboring township (Town of Jacksboro) arrived on the scene to back-up Officer Marlow.

5. Officer Marlow asked Officer Graves to also give Michael Russell field sobriety tests.

6. Michael Russell complied with the officer's request to go through the battery of field exercises a second time.

7. Officer Graves concluded after his examination that Michael Russell was not impaired.

8. The officers questioned Michael Russell regarding his consumption of alcohol.

9. He admitted that he drank at least one alcoholic beverage several hours prior to the stop.

10. The officers' observed empty beer cans in Russell's automobile.

11. The officers' after determining that Russell was not impaired, still refused to let him drive away from the scene and insisted that he call someone for a ride.

12. At approximately 1:00 am, Russell was forced to call his mother to come retrieve him from the scene.

13. The Plaintiff arrived on the scene and was noticeably upset.

4

14. The Plaintiff questioned the officers regarding the events that led to her being woken up, and forced to drive a significant distance to retrieve her physically and mentally capable son.

15. The officers told the Plaintiff that her son was not allowed to drive because he had consumed alcohol earlier in the night.

16. Unsatisfied with what appeared to her to be unreasonable and unnecessary demands of the officers, the Plaintiff expressed her anger and frustration, then began to walk away.

17. As she retreated from the officers, both approached her and physically attempted to subdue her.

18. The officers pushed her against the trunk of a patrol vehicle, pulled her arms behind her back and placed handcuffs on her wrists, seriously injuring her in the process.

19. Because of her pleading insistence, officers uncuffed her then recuffed her to the front of her body.

20. An ambulance was called to the scene to treat the injured Plaintiff.

21. The Plaintiff was brought to Mercy Hospital for medical treatment.

22. Neither the Plaintiff, nor her son were charged with any crimes nor issued any traffic citations on the night of the use of force.

23. Thirty-days later, a warrant was issued for the Plaintiff for the crimes of resisting arrest and interference with a police investigation.

24. Both charges were subsequently dismissed at a preliminary hearing in the Campbell County, Tennessee General Sessions Court.

## VII    Analysis

### A.    The Authority of Law Enforcement

For police officers to effect stops and use force, they must first establish authority over a person. Where a show of authority may be represented by a uniform, badge or firearm, lawful authority is derived from an officer's reasonable belief that a crime has, is or is about to be committed.[1] Officer's who seek to establish the presence of criminal activity are compelled to gather and investigate facts and circumstances to establish probable cause.

Upon reasonable suspicion, officers may elect to hold a person for further questioning and investigation. Strict Constitutional rules control the amount, type and extent of government intrusion that is allowed for the purpose of establishing probable cause. Having only reasonable suspicion, officers may not search a person or place without consent. They may not take a person's property or not allow them access to their property unless the property poses an immediate threat of danger to the investigating officer. Though a person may volunteer information to an officer in the course of conversation or in order to dispel the officer's suspicions, he or she is not required to answer any questions or make any statements that may be self-incriminating. If an officer is unable to gather the requisite information to establish the elements of probable cause for the crime being investigated then he is required to release the person and allow him or her to go about their way unmolested and undisturbed.

Officers, who do not have knowledge of certain facts and circumstances that amount to reasonable suspicion or probable cause that a crime has, is or is about to be committed do not possess authority over an individual and may not forcibly detain that individual or use any force whatsoever to assure compliance with their requests, commands or orders. Absent reasonable suspicion, any force used would be considered excessive and patently unreasonable regardless of the amount, type or extent.

Operating a motor vehicle is a privilege in the State of Tennessee, not a right, and the rules that govern driving are regulated by the Administrative Code of the Tennessee Department of Transportation. A person who chooses to drive in Tennessee gives up certain rights under law and must comply with law enforcement that are tasked with overseeing the administrative code.

An example that most people are familiar with is the traffic stop. Drivers are taught, tested, and it is understood that a police officer may pull over a vehicle for a violation of code and demand certain documents that all drivers are required to carry. If an officer signals a stop to driver, the driver must comply and undergo the officer's intrusion as a condition of being a licensed driver. Officer's may, based upon their observations issue monetary citations for violations of traffic codes like speeding, running stop signs, or making improper turns. If the

---

1 Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)

conduct of the driver amounts to a violation of criminal code, the driver may be arrested and his vehicle searched and impounded incidental to the arrest.

### B. The DUI Investigation

The crime of Driving Under the Influence is indeed a serious offense. According to the FBI Criminal Justice Information Services, over 1.4 million people were arrested for driving under the influence in 2010. Under the laws of Tennessee, driver's are considered to be alcohol impaired "per se" when their blood alcohol concentration (BAC) is .08 grams per deciliter (g/dl) or higher.

In 2010, 10,228 people were killed in alcohol-impaired-driving crashes, representing 31% of all motor vehicle fatalities in the United States.[2]

Through educational campaigns and heavy enforcement, there has been a decrease in DUI related fatalities. Over the last decade alcohol fatalities are down by 29%.

Under Tennessee Code, Title 55, Chapter 10, Section 406, (55-10-406) any person who drives a motor vehicle in the State is deemed to have given consent to a test or tests conducted by law enforcement officials for the purpose of determining the drug or alcohol content of the person's blood. But because of the level and nature of the intrusion, such test are only permitted if the law enforcement officer has reasonable grounds to believe that the driver was operating a motor vehicle under the influence of alcohol, a drug, or any other mind altering chemicals. It is contingent upon the law enforcement officer to inform a driver of this "implied consent" and allow the driver to decide if he or she will comply with the administrative requirement. A failure to comply may result in an arrest and a suspension of the driver's license, regardless of the level of impairment that may or may not be later determined.

Law Enforcement officers are trained to recognize impairment in a variety of different ways. The first most obvious way is to observe behaviors that are known to be consistent with impaired drivers. This might include erratic driving patterns, operating at night without the vehicle's lights on or an investigation of a crash to name a few.

After gathering enough evidence to establish 'reasonable suspicion', a law enforcement officer may lawfully investigate impairment by making personal and direct contact with the driver. This may require a forcible traffic stop by the officer who will activate his overhead lights for instance, to signal the driver to pull to the side of the road.

Law Enforcement officers are trained to approach cautiously, remaining mindful of the suspected vehicle, its drivers and passengers, and the surrounding environment in which the officer operates. Once the officer is safely alongside the vehicle, he is trained to carefully

---

[2] Statistics; courtesy of the US Dept. of Transportation National Highway Safety Administration.

observe the driver in order to gather more evidence to prove that his hunch is correct or that his initial observations were the product of some other plausible and reasonable explanation. The officer will use his natural senses to further his theory of impairment. He will note the odor on or about the driver, attempting to detect the known scent of alcoholic beverage. He will watch the driver, looking for shaky or unsteady movements that might signal physical impairment. He will also engage the driver in conversation so that he can listen to the voice that might reflect sleepiness, hyperactivity, slurring or other irregular speech patterns that might further suggest impairment.

The officer is trained to look inside the vehicle, searching for other environmental clues that suggest alcohol or drug use. If the driver is so inclined, he may allow the officer to search his vehicle upon a simple request. If consent is given the officer may enter the vehicle to the degree that the driver allows him and he may open compartments, check under seats, open the trunk or inspect any area that he is given permission to search. Certain more obvious telltale signs of drug or alcohol use would be items like beer cans, bottles, pills or marijuana leafs, stems or seeds.

The officer's purpose is to prevent a reasonably expected tragedy that would otherwise likely occur if the person were allowed to continue driving while impaired. If the evidence shows that the driver is likely impaired he or she may be immediately arrested and brought in to answer charges of Tennessee's DUI criminal code.

But not every person who is or may be impaired is required to be arrested. Officers' by law have the right to use discretion when investigating subjects who they believe may be impaired. That is to say that an officer may arrest a person for the misdemeanor crime of driving under the influence or, may at their discretion, choose to not arrest.

Discretion is most often tempered through department policy that provides guidelines for officers to follow that are consistent with the agency's philosophy and the community's values, attitudes and norms.

### C.  The Traffic Stop

On May 28th or 29th, 2011 Officer Ben Marlow was driving a marked Caryville Police Vehicle eastbound on Highway 25, just east of Dog Creek Road when the car behind him allegedly swerved to the left. It was around midnight, a common time for drunk drivers. Inside the vehicle was twenty-three old Michael Russell who had just returned from Knoxville after dropping his brother off with some friends. Russell had dropped his phone on the floorboard while driving and had reached to get it. This momentary distraction caused him to jerk his car violently to the left.

Officer Marlow activated his overhead blue lights and Michael Russell immediately pulled to the shoulder of the road and stopped. With the exception of the initial swerve, the officer did not record any information regarding any further visual observations regarding Russell's

8

driving behavior.

When Officer Marlow approached the driver's side window, he asked the driver Michael Russell if he had been drinking, Russell told him that he had consumed a couple beers much earlier in the night. Officer Marlow looked inside the vehicle and could see a case of beer and several empty been cans in the vehicle. Though transporting a case of beer and empty beer cans is not a violation of law per se, the totality of the circumstances gave Officer Marlow "cause' to investigate further the possibility that Russell might be operating the motor vehicle while impaired.

Marlow asked Russell to step out of the vehicle and perform several roadside sobriety tests, to which Russell complied. Officer Marlow recalls conducting a horizontal gaze nystagmus (HGN) test, in which a fixed object is smoothly moved in front of the driver's eyes to opposite points of maximum deviation of the eye socket. The subject is asked to follow the movement of the object with their eyes only, without moving their head. Among other things, alcohol causes the eyes to track erratically, resulting in an unusual jerking of the eyes in the socket, a strong indicator of inebriation. Two other balance tests were conducted including the one leg stand test, where a subject is asked to balance on a single leg while holding the other leg in front of them while counting from a designated number to a designated number, and a "walk and turn" test where the driver is asked to walk along a real or imaginary line touching the heel of the forward foot to the toe of the rear foot for a designated number of steps. The driver is instructed to turn around and walk in the opposite direction using the same heel toe method and counting out loud as he walks. These tests are designed to observe the driver's balance, coordination and ability to follow instructions synchronously.

In his deposition, Officer Marlow recalled that Michael Russell "performed unsatisfactory on his field sobriety test" but Michael Russell recalled that the officer told him that, "he passed", suggesting to Russell that the officer did not find him impaired. According to Officer Marlow, he then called Officer Graves from a neighboring township police department because he had already, "turned in his two weeks notice", and was "moving out of state".[3] It can be deduced that Officer Marlow wanted to turn this stop over to Officer Graves and dismiss himself from further investigation.

When Officer Graves arrived on the scene, he conducted a second set of field sobriety tests. If we are to assume that Michael Russell was found to be too impaired to drive on one or both of the tests, the officer's did not indicate this to him by arresting him.

---

[3] It is implied from this statement that he felt that Michael Russell should be arrested, but he did not want to be troubled by any follow-up procedures that often accompany an arrest like depositions, trials, administrative hearings and the like. See Deposition of Benjamin Marlow pp. 16-17

9

Regardless of whether the officers believed that Michael Russell was too impaired to drive or that they were doing him "a favor" by releasing him it would have appeared to both Michael Russell and his mother Lynn Daugherty that because he was not arrested, that he had not committed a crime.

When Lynn Daugherty arrived on the scene she was noticeably upset. She questioned the officers regarding their authority to prevent him from driving his vehicle, and in light of her paradigm her question was a legitimate one.

On the videotape, Lynn Daugherty can be seen for the first time at segment 01:07:32 approaching the officers. The camera captured her approaching them with a steady gait. At 01:07:36, one of the officers volunteered the information, "he's been drinking" to which Lynn Daugherty stopped, placed both her hands in a non-threatening position on her hips and replied, "Is he legally drunk?"

Her voice was not raised, but it was matter-of-fact. Her question deserved an answer. She has just been inconvenienced by being summoned from her bed and made to drive quite a distance. The video shows that it is 1:07am.

The officers were unable to answer her questions in a satisfactory way. At 1:07:48, Daugherty asks, "Did he pass the test, did you give him a sobriety test?" to which one of the officers states, "there is no pass there is no fail."

This ambiguous answer further agitated Lynn Daugherty. "What do you mean there is no pass or no fail?" For several seconds the officers and Daugherty discuss the bizarre idea that a test could exist without measures. Daugherty asked, "you don't have a breathalyzer?" to which the officers explained that they couldn't give a breathalyzer roadside.

Having no satisfactory evidence that her son was impaired, Lynn Daugherty became defensive. Her body language moved to a closed posture as she crossed her arms across her chest. One of the officers said, "there's no reason to be like this", apparently not considering the extreme inconvenience that Daugherty was being exposed to. Daugherty had already taken the long, late night drive to this location and it was clear that the officers, on a mere whim, were not going to allow her son to drive. The logistics of this imposition did in fact give Daugherty reason to "be like this." Her imposition was going to extend into the next day. She would have to leave her vehicle on the side of the road or get it towed. She would then have to drive back to this or another location to retrieve it, and perhaps pay a towing bill, all because of an arbitrary decision by police officers who could not produce any evidence that her son had done anything wrong.

Daugherty tried to plea with them, "Why cannot he drive home?" to which the officer answered, "when he gets down the road and kills somebody, its our ass!" This statement couldn't be any farther from the truth and Lynn Daugherty seemed aware of it.

10

It is a well-established principle of law that law enforcement officers do not have a duty to protect and cannot be held responsible for the hypothetical possibility that someone might harm someone else.[4] Once the officers released Michael Russell from their custody, no special relationship would continue to exist.

This added to the frustration she was already experiencing by having been drawn from her bed, forced to get dressed and forced to respond a significant distance to retrieve her 23 year old apparently capable son. Her frustration is understandable and it is certain that she did not believe, as the officer's suggested, that they were doing her any favors at all.

Perhaps it is a disposition of the officers of the Caryville and Jacksboro Police departments to believe that releasing someone from a custodial interview is a favor. This sentiment was echoed by opposing counsel in the deposition of Lynn Daugherty when the statement was made in the form of a question; " I don't understand why you would be agitated when no one was getting arrested, they were letting him go home. Explain that to me?[5] Followed by, "And I'm just trying to figure out, if a cop tells you we are not going to let him drive home, who are you to question their judgment?"[6]

Traffic stops are temporary custodial stops and drivers are required to comply with an officer's orders to present a drivers license, insurance card, proof of insurance and to allow them attempt to detect impairment if they are reasonably suspicious that the driver is not fit to operate a motor vehicle. But like any other custodial detention, if an officer concludes that their suspicions are unfounded, they are required to release the subject of the stop, effectively losing all state granted authority over them. On the contrary, if an officer's hunch is well founded and probable cause exists for an arrest, then they may chose to make an arrest and take an offender into custody for the purposes of answering to the commission a crime.

The police officer's role is not paternalistic. Though they may bargain with a person to construct an alternative response to an arrest, they may not enforce commands that are not agreed to simply because they are the police. When the officers told Michael Russell that he was not allowed to drive his vehicle, after allegedly satisfying their suspicions of not being impaired (as evidence by his non-arrest) they overstepped their boundaries and authority as enforcers. Without the requisite probable cause for an arrest, the officer's authority over Michael Russell would have ended and he should have been free to drive his vehicle if he had chosen to.

---

4 DeShaney v. Winnebago County Department of Social Services, 489 U.S. 189 (1989)
5 See Deposition of Lynn Daugherty pp. 71, lines 13-15
6 Ibid, pp. 76 lines 14-16

11

### D. The Arrest of Lynn Daugherty

The call to Lynn Daugherty by her son Michael was made after midnight, in the early morning hours of May 30, 2011. Michael sounded confused on the other side of the phone as he asked her to come pick him up at a location more than 20 minutes away from her home. He told her that the officers didn't want him driving and when she asked him why, he said, "I don't know". He ended the conversation abruptly by saying, "I just need you to come get me."[7]

Daugherty had a lot of questions as to why her otherwise perfectly capable son, who was driving a functionally good vehicle, needed her to get out of bed, force her to get dressed, and drive through the dark night to pick him up. She stated that she was confused and worried because she didn't understand what was going on.[8] Nonetheless, she got out of bed, pulled clothes over her gown, put on a pair of flip flops and drove to where Michael had been stopped on the shoulder of the road in Jacksboro.

When Daugherty arrived on the scene she observed her son Michael standing with Officer Marlow and Officer Graves. There was no one else on the scene. As Michael started to walk towards her, she ordered him to her car and told him to get in it. He immediately complied without further conversation.

Daugherty continued towards the officers and asked them what was going on. She recognized Officer Marlow of the Caryville, Police Department but didn't know Officer Graves from the Jacksboro Police Department. Daugherty had prior contact with Officer Marlow after her other son Bobby had been arrested for allegedly driving with a revoked driver's license. Bobby had also told her, that the Caryville Police Department would frequently follow him as he exited the highway and he had perhaps become the target of excessive police attention. Though Daugherty could not know which officer or officers of the Caryville police Department were targeting her son she reasonably believed that it might be Officer Marlow, since he had been the arresting officer and knew the vehicle.

If Daugherty believed that the Toyota Tercel that was usually driven by Bobby, but had on this night been driven by Michael, was the target of excessive and unfair attention by Officer Marlow it is reasonable that she might have formulated in her mind that Officer Marlow was abusing his authority and power as a police officer by stopping the car without sufficient cause in order to perhaps catch Bobby once again driving with a suspended/revoked drivers license.

---

[7] See Deposition of Lynn Michelle Daugherty pp. 40, lines 8-13
[8] See Deposition of Lynn Michelle Daugherty pp. 42, lines 2-4

12

Understanding this history, allows us to understand why Lynn Daugherty would be so agitated upon her arrival. Her analysis of the situation formed her perceptions. Not only did she feel that her family was being unfairly targeted by the Carville Police Department, this aggressive police behavior had now needlessly and unreasonably inconvenienced her.

Regardless of whether Lynn Daugherty's hunch was accurate or not, it was her perceptions that resulted in her agitated disposition. She admittedly raised her voice to the officers and related her disgust of their abuse of power. She later even challenged their authority by telling them that they did not have the jurisdiction to arrest her.

Properly trained police officers however are taught to manage a variety of emotions that are presented to them regularly by people who they interact with. For it is understood that when the police interact with citizens on calls for service, it is often because something is not quite right or may be terribly wrong. Officers will, on any given day, likely be faced with emotions ranging from mild to extreme. Using a variety of interpersonal skills and techniques they are expected to de-escalate highly emotional individuals, diffuse aggression and restore calm to the police investigation. This is the basic premise for reducing incidents of use of force.

When Lynn Daugherty questioned them about why they wouldn't allow her son to drive the car home, their poor explanation caused her agitation to grow. The officers informed her that each one of them had individually inspected Michael's condition and had not detected any signs of impairment. He was over 21 years old, was not being arrested, the vehicle was functional and based upon his mere admission that he had consumed alcohol several hours earlier, they were not going to allow him to drive.

This seemed patently unfair to Lynn Daugherty. Though she was not a police officer or a lawyer, she knew enough about her rights as a citizen to know that this decision was unreasonable and excessive. Tennessee law does not allow law enforcement officers to arbitrarily seize the property of another person without a warrant or probable cause. By forcing Michael Russell to find a ride home, government officials denied him access to his own property. This is tantamount to a seizure. The officers would have had to tow the vehicle or leave it on the roadside where it could be vandalized, struck by a passing motorist or burglarized by a passer-by who noticed it to be an easy target. This intrusion without cause is patently unreasonable and a violation of Daugherty's and Russell's Fourth Amendment rights. Neither the Jacksboro Police Department nor the Caryville Police Department provided guidelines for the officers to limit their unbridled use of police power.

Maturity and professionalism dictates that an officer, having been faced with an irritated, angry but otherwise harmless citizen should always attempt to diffuse the anger and frustration felt by citizens who are inconvenienced by law enforcement practices. In most cases, angry citizens are just looking for an opportunity to vent. Venting may be loud, rude or even insensitive to the officers' feelings; but officers are trained to endure this, learning early on not to take any non-harmful dialog personally.

It is understood that if left alone angry citizens will most often voluntarily disengage from any further conversation. In this case it would have been significantly better for the officers to simply disengage and return to the business of patrolling the Townships. But it appears from the video that Lynn Daugherty managed to get under the officers' skins, inciting personal insecurities by telling them that they didn't have authority and that they would need a highway patrolman to arrest her.

The officers made this comment the issue and they began to recite their personal resumes, which was unceremoniously captured on the police video. "I am the PO-LEECE", "I have arrested hundreds of people on this street", "Do you see this badge?" As Daugherty disengaged and attempted to walk away, the officers pursued her and continued to antagonize her regarding her opinion. As the officers moved into Daugherty's personal space she turned to face them.

It is likely that as Lynn Daugherty turned towards them that she went into a defensive mindset. She was being assaulted as the police officers invaded her personal space and projected to her what reasonably appeared to be a physical confrontation. She hollered, "get out of my face."

The video shows that Officer Graves reached out and grabbed Daugherty. He pulled at her arm, attempting to get it bent behind her back while ambitiously trying to handcuff her.

When Officer Graves grabbed at Lynn Daugherty, she reeled back attempting to defend herself against the unexplained, aggressive and unreasonable behavior of the officer. It would seem obvious to a reasonable person that Lynn Daugherty was not resisting arrest; she was resisting an unlawful arrest. This was not a simple clash of paradigm where she believed one thing and the officers believed another. She had simply voiced an opinion, raised her voice and then walked away. She had not violated any laws at all.

As Graves pulled violently on her arm it is objectively reasonable that Lynn Daugherty would have been quite scared believing that the officers were intent on causing her some type of harm. She may have braced and tensed to protect a prior injury to her lower back. She can be heard telling the officers to use caution because of this injury. But the officers forcibly pulled her arms behind her back and handcuffed her.

14

The officers unlawfully arrested Lynn Daugherty and violated her Constitutional rights as guaranteed by the Fourth and Fourteenth Amendments and it appears that the officers' unlawful arrest and presentation of force were proximate to injuries suffered by her.

Based upon my understanding of accepted police procedures, professional use of force, defensive tactics and arrest techniques, it is my finding that within a reasonable degree of certainty the arrest and subsequent force used by Officers Marlow and Graves was excessive, unreasonable and unnecessary in light of the facts and circumstance sufficiently known to them at the time they unlawfully grabbed Lynn Daugherty.

As additional information is made available and as new facts may be uncovered during the discovery process, my professional opinions may change to reflect the newfound information; however, the opinions expressed herewith are current and are based upon the information reviewed and my experience as of this date.

## F. Fee Structure and Recollected Cases

My rate of compensation is a flat fee of $2900.00 for the case review and the submission of a report. Depositions are compensated at a flat rate of $1000.00 for a regular deposition, $800.00 for a Tallahassee deposition. Trial appearance is compensated at a rate of $1200.00 per day. Reasonable reimbursement for travel and meals is not included in these rates.

The following are cases in which I recall testifying in within the past four years:

- **State of Florida vs. Augustine Wylie** Case No: 06-CF-019669
  Circuit Court, Twentieth Judicial Circuit in and for Lee County
  - *Deposition 12/12/08*
  - *Pre-Trial Immunity Hearing 01/13/2010*
    Retained by Defendant

- **Roeber vs. Makowiecki et al** 8:2007cv00954
  Florida Middle District Court
  - *Trial 09/23/08*
    Retained by Defendant

- **State of Florida vs. Edward Graziano** Case No: CRC09-03815CFANO
  Circuit Court, Sixth Judicial Circuit in and for Pinellas County
  - *Deposition 05/12/10*
    Retained by Defendant

- **State of Florida vs. Jan Patrick Squire** Case NO: 09-010629CF

15

Circuit Court, Twelfth Judicial Circuit in and for Sarasota County
- *Trial 02/07/10*
Retained by Defendant

- **Hamilton vs. LaJoie et al** 3:2007cv00148
Connecticut District Court
- *Deposition 11/03/10*
- *Trial June 21, 2010*
Retained by Plaintiff

- **State of Florida vs. Alan Wayne Rice** Case No: 09-59CF
Circuit Court, Fourteenth Judicial Circuit in and for Jackson County
- *Qualified expert in Self Defense, Defensive Tactics, Police Use of Force*
- *Pre-Trial Immunity Hearing 05/26/10*
Retained by Defendant

- **Keys vs. City of Chicago et al** 1:2009cv04162
Illinois Northern District Court
- *Deposition 11/03/10*
Retained by Plaintiff

- **Joseph Lamar Knight vs. Forsyth County, et al** 1:09-CV-1790
Georgia Northern District Court
- *Deposition 12/02/10*
Retained by Plaintiff

- **Thomas vs. Borough of Swissvale, et al** 2:09-CV-996-NBF
Western District of Pennsylvania
- *Deposition 06/07/11*
Retained by Plaintiff

- **Commonwealth of Massachusetts v Eugenio Lopes**
Massachusetts Court of Common Pleas
- *Trial 06/27/11*
Retained by Defendant

- **State of South Carolina v County of Jasper, et al**
In the Court of Common Pleas
- *Trial 09/28/12*
Retained by Plaintiff

16

_____  10/30/12
Roy R. Bedard               Date

STATE OF FLORIDA
COUNTY OF LEON

Sworn to or affirmed and signed before me, by Roy R Bedard, who is known to me OR has produced a Florida Driver's License as identification this 30th day of Oct, 2012

_____
NOTARY PUBLIC – STATE OF FLORIDA

[stamp]


KRISTINA L. OSBORN
Notary Public - State of Florida
My Comm. Expires Mar 25, 2015
Commission # EE 72656

17